UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                                  Case No. 8:20-cr-155-T-60SPF

JAMES JAMAL CURRY
_____/

### MOTION TO DISMISS FOR FAILURE TO STATE AN OFFENSE

**COMES NOW** Defendant, James Jamal Curry, by and through undersigned counsel, and moves this Court to dismiss the indictment for failure to state an offense.  Mr. Curry requests a hearing on this motion.

### MEMORANDUM OF LAW

In this case, the Government has charged Mr. Curry with perpetrating a "biological weapons hoax" under 18 U.S.C. § 1038 for spitting on a local police officer while he was being arrested, and then stating that he had COVID-19.  A straightforward application of *United States v. Bond*, 572 U.S. 844 (2014), demonstrates that § 1038 does not reach this unremarkable local offense of simple assault on a police officer.

### FACTS

According to the Government's complaint, on March 28, 2020, Mr. Curry spit on a Saint Petersburg police officer and said, "I have corona, bitch, and I'm spreading it around."  COVID-19 is a novel coronavirus that had spread to the level of a pandemic by March 2020.  While scientific studies are mixed, the Centers for Disease Control and Prevention's most recent "best estimate" provides an infection fatality rate–the percentage of people who die because of infection from the virus–of approximately .65%.[1]  The infection fatality rate is far lower in

---

[1] Centers for Disease Control and Prevention, "COVID-19 Pandemic Planning Strategies" (Jul.

young and healthy people.  A very large percentage of those infected with COVID-19 develop no symptoms whatsoever.  Mr. Curry was promptly tested for the virus and found to be uninfected.  The police officer he spit on was also not infected.

The Government's single-count indictment alleges that Mr. Curry

> did engage in conduct with the intent to convey false and misleading information, that is, that the defendant was infected with the COVID-19 virus and was intentionally spreading the virus to other individuals, under circumstances where such information may reasonably have been believed, that indicated that an activity had taken, and was taking, and would take place that would constitute a violation of 18 U.S.C. § 175(a), specifically, that the defendant knowingly had possessed, was possessing, and would possess, and also that the defendant knowingly had transferred, was transferring, and would transfer, a biological agent, that is, the COVID-19 virus, for use as a weapon.
>
> All in violation 18 U.S.C. § 1038(a) and (a)(1)(A).

### ARGUMENT

This prosecution is foreclosed by *Bond*.  The statute under which Mr. Curry is charged provides:

> Whoever engages in any conduct with intent to covey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of section 46504, section 46505(b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49, shall –
>
> (A) be fined under this title or imprisoned not more than 5 years or both . . . .

---

10, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html#table-1 (last visited Jul. 20, 2020).

18 U.S.C. § 1038(a)(1). The indictment alleges that the predicate "activity" about which Mr. Curry intended to "convey false or misleading information" was a violation of 18 U.S.C. § 175(a). That statute is located in Chapter 10 of Title 18. It provides:

> Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under the section committed by or against a national of the United States.

18 U.S.C. § 175(a).

As used in § 175(a), the term "biological agent"

> means any microorganism (including, but not limited to, bacteria, viruses, fungi, rickettsiae or protozoa), or infectious substance, or any naturally occurring, bioengineered or synthesized component of any such microorganism or infectious substance, capable of causing –
>
> (A) death, disease, or other biological malfunction in a human, an animal, a plant, or another living organism;
>
> (B) deterioration of food, water, equipment, supplies, or material of any kind; or
>
> (C) deleterious alteration of the environment[.]

18 U.S.C. § 178(1). As used in § 175, the term "for use as a weapon" includes "the development, production, transfer, acquisition, retention, or possession of any biological agent, toxin, or delivery system for other than prophylactic, protective, bona fide research, or other peaceful purposes." 18 U.S.C. § 175(c).

3

In *Bond*, the defendant spread chemicals around her romantic rival's property. *Bond*, 572 U.S. at 852. The chemicals are toxic to humans and, in high enough doses, potentially lethal. *Id*. However, the defendant merely intended to cause an uncomfortable rash, and the victim only suffered a minor burn on her thumb that she treated by rinsing with water. *Id*. The defendant was convicted of possessing and using a chemical weapon under 18 U.S.C. § 229(a). *Id*. at 852-53. That statute implements the Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction ("Chemical Weapons Convention"). *Id*. at 855-56. The Chemical Weapons Convention was an international response to the use of chemical weapons in war crimes and acts of terrorism. *Id*. at 849-50, 856.

Section 229 prohibits a broad range of activity, including to "transfer," "possess," or "use" "any chemical weapon." *Id*. at 851 (citing 18 U.S.C. § 229(a)(1)). The statute defines "chemical weapon" as "[a] toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose." *Id*. (citing 18 U.S.C. § 229F(1)(A)). A "toxic chemical" is "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. The term includes all such chemicals, regardless of their origin or of their method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere." *Id*. (citing 18 U.S.C. § 229F(8)(A)). Last, "purposes not prohibited by this chapter" means "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity" and certain other specific purposes. *Id*. (citing 18 U.S.C. § 229F(7)).

4

The Court noted the parties' extensive arguments about whether Congress possess the constitutional power to enact § 229 and, citing the doctrine of constitutional avoidance, considered first the question of whether the statute covers the defendant's conduct. *Id*. at 855 (citations omitted). The Court began with the Chemical Weapons Convention, noting its anti-war-crimes and terrorism purposes, and expressing doubt that "the sovereign nations that ratified the Convention were interested in anything like Bond's common law assault." *Id*. at 856. Next, the Court considered principles of federalism, and noted that that the Court "avoid[s] reading statutes" in a manner that would "'dramatically intrude[] upon traditional state criminal jurisdiction'" "in the absence of a clear indication" from Congress that such an intrusion was intended. *Id*. at 857 (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)).

Given the possible intrusion of § 229 into traditional state affairs, the Court required a clear statement from Congress indicating a broad scope for the statute:

> In this case, the ambiguity derives from the improbably broad reach of the key statutory definition given the term – "chemical weapon" – being defined; the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so in light of the context from which the statute arose – a treaty about chemical warfare and terrorism. We conclude that, in this curious case, we can insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the police power of the States.

*Id*. at 859-60 (citing *Bass*, 404 U.S. at 349).

The Court found no such clear indication in § 229. First, the Court noted that the term "chemical weapon" is defined "extremely broadly," but that the broad definition "does not constitute a clear statement that Congress meant the statute to reach local criminal conduct." *Id*. at 859. Instead, a natural reading of "chemical weapon" "takes account of both the particular

5

chemicals that the defendant used and the circumstances in which she used them." *Id*. at 860-61. Applying that understanding to the facts of the case, the Court noted that "[t]he substances that Bond used bear little resemblance to the deadly toxins that are of particular danger to the objectives of the Convention." *Id*. at 861 (internal quotation and citation omitted).

> More to the point, the use of something as a "weapon" typically connotes "[a]n instrument of offensive or defensive combat," Webster's Third New International Dictionary 2589 (2002), or "[a]n instrument of attack or defense in combat, as a gun missile, or sword," American Heritage Dictionary 2022 (3d ed. 1992) . . . . Nor do the other circumstances of Bond's offense–an act of revenge born of romantic jealousy, meant to cause discomfort, that produced nothing more than a minor thumb burn–suggest that a chemical weapon was deployed in Norristown, Pennsylvania. [The chemicals at issue] might be chemical weapons if used, say, to poison a city's water supply. But Bond's crime is worlds apart from such hypotheticals, and covering it would give the statute a reach exceeding the ordinary meaning of the words Congress wrote.

*Id*. at 861.

The Court confirmed its ordinary reading by noting that a literal reading of the definition "would sweep in everything from the detergent under the kitchen sink to the stain remover in the laundry room." *Id*. at 862. Under a literal reading, "[a]ny parent would be guilty of a serious federal offense–possession of a chemical weapon–when, exasperated by the children's repeated failure to clean the goldfish tank, he considers poisoning the fish with a few drops of vinegar." *Id*.

This sort of reading, the Court said, would tread on traditional state police powers, and would "transform the statute from one whose core concerns are acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of assaults." *Id*. at 863. Further, the Government identified only a "handful" of prosecutions under § 229, and

6

"[m]ost of those involved either terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people." *Id*. at 863-34 (collecting cases). Accordingly, the Court held that the defendant's conduct was not covered by the statute, without reaching the constitutional issue. *See id*. at 866.

Courts following *Bond* in other contexts have uniformly applied the Court's sliding scale, which "takes account of both the particular chemicals [or biological agents] that the defendant used and the circumstances in which she used them." *Id*. at 860-61. That is, the "type and use" factors "are properly considered together to determine if, on balance, the substance in question is naturally understood as a chemical (or biological) weapon." *United States v. Le*, 902 F.3d 104, 114-15 (2d Cir. 2018). A particularly strong showing on the "type" factor may be sufficient, such as where the toxin or agent at issue is highly deadly and serves no purpose other than to kill. *See id.* Also, a strong showing on the "use" factor may be sufficient, such as when relatively harmless chemicals are used to poison a community's water supply (to use the *Bond* Court's example). *See id.* at 115 n.9.

For example, in *United States v. Hale*, 762 F.3d 1214, 1225 (10th Cir. 2014), the defendant was involved in a bankruptcy dispute, and mailed an envelope to the U.S. trustee that contained unidentified material and a note that read, "Possible Haz-mat? Termites or Hanta virus from mice?" *Id*. at 1219. Trial evidence explained that hantavirus is a Class Three agent in the four-level bioterrorism classification system, and that its infection fatality rate is about 50%. *Id*. The defendant sent the envelope in retaliation for the trustee's exercise of her duties. *Id*.

Reviewing the defendant's conviction under § 1038, the Tenth Circuit affirmed. The court noted that Hale claimed to send a highly deadly virus through the mail in retaliation against

7

an official's discharge of her duties as an officer of the court. *Id*. at 1225. Distinguishing *Bond*, the court explained that acts like the defendant's are "in natural parlance" referred to as "terrorism." *Id*.[2]

All of the concerns that animated the *Bond* holding are present here. Section 175(a), on which the indictment's § 1038 charge relies, is Congress's implementation of the Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on their Destruction ("Biological Weapons Convention"), just as the statute in *Bond* implements the Chemical Weapons Convention. *See Le*, 902 F.3d at 109-10. Just as with the Chemical Weapons Convention, the nations party to the Biological Weapons Convention had a weighty and broad purpose to achieve "general and complete disarmament" of "all types of weapons of mass destruction," in an effort at "mitigating the horrors of war . . . ." Biological Weapons Convention, 26 U.S.T. 583, 1015 U.N.T.S. 163.

Further, as with the chemical weapons statute in *Bond*, the Biological Weapons Act has an "improbably broad reach." The key definition of "biological agent" covers any microorganism capable of causing any "disease" in humans, animals, plants, or other organisms. 18 U.S.C. § 178(1). Its literal sweep is so broad as to reach the common cold, a dog's kennel

---

[2] *See also Le*, 902 F.3d at 112-17 (affirming conviction for defendant's acquisition through the internet and mail of the highly deadly toxin ricin to sell to others who would use it to murder); *United States v. Levenderis*, 806 F.3d 390, 399 (6th Cir. 2015) (affirming conviction where defendant possessed enough ricin to kill more than 250 people in elaborate suicide plot that could have harmed first responders and the surrounding community); *United States v. Kimber*, 777 F.3d 553, 562 (2d Cir. 2015) (affirming conviction where defendant placed large amounts of mercury in a hospital to make people fearful of going there, calling the conduct "quintessential terrorism"); *United States v. Fries*, 781 F.3d 1137, 1149 (9th Cir. 2015) (affirming conviction where defendant placed two chlorine bombs in a neighborhood that created a deadly gas cloud 1,000 feet long, 100 feet high, and 200 feet deep).

cough, or a houseplant's powdery mildew. The Biological Weapons Act is more "improbably broad" than the Chemical Weapons Act at issue in *Bond*, which is at least limited to those chemicals that can cause "death, temporary incapacitation or permanent harm to humans or animals." 18 U.S.C. § 229F(8)(A).

Further, because of this broad reach, just as in *Bond*, § 175 has the potential to "dramatically intrude[] upon traditional state criminal jurisdiction." *Bond*, 572 U.S. at 857 (citation omitted). The alleged facts of this case illustrate the point: the Government attempts to use the statute to prosecute one individual for spitting on another individual, a quintessentially local assault. All of the factors that triggered *Bond*'s clear-statement rule are present here: an improbably broad reach, federalism concerns, and no apparent justification, given that the statute is the implementation of a treaty concerned about "weapons of mass destruction" and "mitigating the horrors of war." Accordingly, as every other court has following *Bond*, this Court should require a clear statement of intent from Congress before applying the Biological Weapons Act (and by extension § 1038) to purely local conduct. *See Le*, 902 F.3d at 113-17 (applying *Bond*'s mode of analysis to the Biological Weapons Act); *Levenderis*, 806 F.3d at 399 (same); *Hale*, 762 F.3d at 1225 (applying *Bond*'s mode of analysis to a § 1038 prosecution predicated on the Biological Weapons Act).

Here, no such clear statement appears. Like in *Bond*, § 178's broad definition bears no relation to the ordinary meaning of "biological agent." Under a literal reading, "[a]ny parent would be guilty of a serious federal offense–possession of a [biological weapon]–when, exasperated by the children's repeated failure to clean the goldfish tank, he considers [sickening] the fish with a few drops of [algae]." *See Bond*, 572 U.S. at 862.

9

Further, *Bond*'s "type" and "use" factors do not show that Mr. Curry's conduct is covered by the statute. First, COVID-19 infection is rarely deadly, frequently asymptomatic, and often mild. Like the chemicals in *Bond*, COVID-19 "bear[s] little resemblance to the deadly toxins that are of particular danger to the objectives of the Convention." *Id*. at 861 (internal quotation and citation omitted). COVID-19 similarly bears little resemblance to those biological agents approved by the courts since *Bond*, such as the highly deadly ricin of *Le* and *Levenderis*, or the hantavirus of *Hale*, which kills half of the people it infects.

Second, the circumstances under which Mr. Curry "used" COVID-19 (or pretended to do so) bear no resemblance to acts of assassination, terrorism, or "combat," as described by *Bond*. Nor is his conduct that of possessing or transferring a "weapon" by any other definition. *See Le*, 902 F.3d at 115 (proposing "an instrument *designed* to be used to injure or kill someone" as an alternative definition) (citation omitted). Mr. Curry feigned to have *contracted the virus himself*. The Government implausibly describes this as "possession" of the virus in the indictment. His act of spitting at the officer was a spontaneous response to being arrested. This faux "transfer" of the virus (as the indictment calls it) would never in "common parlance" be referred to as a "biological weapons attack," and is nothing like the quintessential terrorism of *Hale*. Rather, like in *Bond*, this was a purely local, simple assault.

As *Bond* makes clear, this is not to say that conduct involving COVID-19 can *never* constitute a Biological Weapons Act offense. Just as the mildly harmful chemicals in *Bond* would have satisfied the statute had the defendant put them in the water supply, so too can one imagine scenarios in which COVID-19 becomes a biological weapon. If the virus were placed into a delivery system to infect a new population, surely it would be possessed "for use as a

weapon." It may even be possible to imagine scenarios where a person who has contracted the virus violates the statute–such as where a state actor directs its agent, infected with the virus, to spread it surreptitiously in an unsuspecting population.

"But [Mr. Curry's] crime is worlds apart from such hypotheticals, and covering it would give the statute a reach exceeding the ordinary meaning of the words Congress wrote." *See Bond*, 572 U.S. at 861. By the time of the alleged offense in late March 2020, COVID-19 infection had already reached the level of a pandemic, and was already spreading through Florida and the United States like wildfire. Mr. Curry's simple assault and accompanying speech, even if believed, do not constitute a false "possession" or "transfer" of a biological weapon under *Bond*. His conduct thus does not fall within the ambit of § 1038.

Lastly, the reasons for relying on the canon of constitutional avoidance are even stronger here than they were in *Bond*. A ruling that the statute applies to Mr. Curry's conduct will require this Court to determine whether Congress has the constitutional authority to enact the statute under the Necessary and Proper Clause, the question the Court avoided in *Bond*. Further, should the Government seek to rely on the Interstate Commerce Clause, though it declined to do so in *Bond*, the Court may have to answer whether that constitutional provision grants Congress the powers the Government claims. And, distinct from the situation in *Bond*, the Government here seeks to punish Mr. Curry for the content of his speech. Thus, if the statute applies to this conduct, the Court must decide whether § 1038 is unconstitutional under the First Amendment, facially and as applied, and whether it is unconstitutionally vague.

As a separate motion will seek to demonstrate, these are large and complicated constitutional issues. On the strength of *Bond*, Mr. Curry presents better than a "fairly possible"

11

interpretation of § 1038 that avoids these issues.  *See Nat. Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012).  This Court should adopt this reasonable interpretation and dismiss the indictment.[3]

**WHEREFORE** the Defendant, Mr. Curry, prays this Court will dismiss the indictment.

DATED this 28th day of July 2020.

        Respectfully submitted,

        JAMES T. SKUTHAN
        ACTING FEDERAL DEFENDER

        */s Samuel E. Landes*
        Samuel E. Landes
        D.C. Bar No. 1552625
        Assistant Federal Defender
        400 North Tampa Street
        Suite 2700
        Tampa, Florida 33602
        Telephone:     (813) 228-2715
        Facsimile:      (813) 228-2562
        Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th of July 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:     AUSA Frank Murray.

        */s Samuel E. Landes*
        Samuel E. Landes
        Assistant Federal Defender

---

[3] To the extent this Court must rely on facts outside of the indictment to resolve the statutory question presented by this motion, such as the circumstances of the alleged offense or the nature of COVID-19, it should notify "the prosecution that if it proceeds on no more evidence than has been proffered if can expect a motion for judgment of acquittal to be granted."  *See United States v. Critzer*, 951 F.2d 306, 308 n.2 (11th Cir. 1992).